States of America v. Londono. And we will hear first from Mr. Clough. Good morning. I may have pleased the court. This case began on an extradition from Argentina and unique in the, at least in my reading of the case law, every single factual component of the extradition basis, the factual basis for the extradition which is required by Argentina because Argentina doesn't really have exactly the same laws that we do. So they have to determine whether the conduct matches for double criminality purposes what they have with their legal concert and illicit association type offenses. Every single factual component is different. Every witness that is relied on for that component is different. The fundamental premise of that application that the defendant had to be guilty because he was the leader of the drug trafficking organization and thus everything that the drug trafficking organization naturally benefited him and he profited from it. And so one could interpret from that. Every, and of course the only thing that the Argentinian then had was the other list of co-conspirators. When we get to trial, the entire trial, and you can search the trial transcript, there is never even a mention of an indicted co-conspirator. And there were seven of them I believe. Not a single one is ever mentioned once in trial. There is not a single mention of anything, any other part of the factual basis other than things that contradict it. Which he was not the leader of a drug trafficking organization. The theory was that he had become, he had associated himself with the organization with specific tasks assigned to him. It did not give him that necessary connection. So in this case unlike Puentes that the government cited, there was not a finding by the court there that the evidence given supported the overall allegation of such and such. And it was supportive of that. In this case, Argentina relied on a different case and extradited on a different case. And the cases that we cited and the case that the government cites, the Urbidge case, Urbidge makes clear that in this context it's conduct that the countries are extraditing on. Because otherwise you can't extradite on biography. And so the conduct here. Let me ask you something. How do we, I mean how would we draw the line here? Because it's clear from our case law that we have said that you can use evidence, you can use evidence even from charges that the extraditing country refused to extradite on in support of an offense that has been charged. And so how would we draw the line? Because I think I hear you saying that you agree that we, that the government can use evidence other than what was charged and what was told to the extraditing country. But it just can't use, but the government can't cross the line in this case. So what is the rule that you would propose that would differentiate between those scenarios? Unless I've misunderstood your argument. No, I think the court's exactly on it. The line that should be drawn is when you're dealing with a treaty in which the country applies a conduct-based rule and when the country requires the facts that support the demonstration of that conduct. And when there is a complete disconnect, a complete disconnect, not as in Puentes there was an overlap. And in all the other cases there's a great overlap. And essentially the government is on the same dartboard but they're just not in the center anymore. Here it's a different dartboard. And that's where the line seems to be, at least for this purpose, because I don't think the court has to draw the line for every case. But in this case with regard to Argentina's treaty, with regard to the way it was presented to Argentina, and the complete separation, there's no Venn diagram where these two circles realistically connect other than in contradiction. So tell me why this is wrong. So count one of the indictment described a specific conspiracy between October 2006 and February 2012 to distribute drugs with the intention that they be imported into the United States. Is that correct? Yes. It also named specific co-conspirators. And then the supporting affidavit described a conspiracy involving the transportation of thousands of kilograms of cocaine from Colombia to Central America, Mexico, and the United States between April 2009 and February 2012, and then provided more specific information about meetings and transportation of drugs between June 2008 and July 2011. Is that right? Yes. And then your client was tried and convicted of the offense for a specific drug trafficking conspiracy during a specified time period as alleged in the indictment, right? Well, I think as the indictment proceeded to trial, he was convicted of that charge. But nothing of what was before Argentina, neither the co-conspirators, neither the type, the means in which you attribute liability to him, the respondeat superior because he's supposed to be the leader, nothing. And instead, at trial, when you go to the review, the government's review of the testimony, we didn't do a witness by witness, but the government did, you look at the majority of them, and their theory of liability is likely one that Argentina would not have adopted. It's the same charge, right? It is the same statute that the person is charged under. I would not say it is the same charge in the sense that Argentina would not say it's the same charge. And that's the key because we're not just dealing with how we ordinarily treat a variance or a constructive amendment. Sure, this might only be a variance, but if you treat this statement of summary of facts to Argentina the way Argentina does, which is as a bill of particulars, which protects against double jeopardy, which they have a right to do, which protects to ensure double criminality is applied, which they have a right to do, then it is not the same. Because if that was the bill of particulars, this was not that case. This was a different conspiracy. This was a conspiracy that said, no, no, he had some taxing responsibilities in the Medellin area. And in his taxing responsibilities, you can attribute to him liability for the cocaine trafficking that the people that paid tax to him paid. Again, a theory never given to Argentina. They got the theory that it's his drugs, it's his operation, it's his money, it's his investments, everything. It's his drug trafficking organization. But isn't it the case that the folks who paid him the tax allegedly wouldn't have been able to import the cocaine to the United States unless they did so? There's no question that there are some cases in some courts in the United States that would uphold a conspiracy theory under the drug tax theory, even though he has no skin in the game. Usually, most other courts would say, no, you need to have skin in the game for him to be a conspirator, because a conspirator is not usually adversaries. Why doesn't he have skin in the game, though, if the drugs can't be imported but for the payment of the tax? I mean, skin. I'm talking about not playing with house money. I'm talking about playing with your own money on the table. You know, you have cases where people – and there were some allegations to this effect that the organization would say in some instances, yes, send some drugs for us, too. There were a couple of allegations of that. But in really, I think, the majority of them, there's not that. There's none of that type of skin in the game that – it's house money in that sense. And that's why it's – for Argentina – and that's what's so difficult here, is respecting the international relations at issue. For Argentina, this is not what they extradited on. They didn't extradite on, oh, he didn't do any of the things that you said he did. He wasn't the person that you said he was. He was some other guy in some other area, and he was doing – he was not actually shipping his own drugs, because the government says, just rely on one witness. That was one of their arguments. And any one of those witnesses would have said he was taxing. Before you run out of time, did you want to address any of the other issues in your brief? The level of non-disclosure in this case due to the destruction is just remarkable. What was – is clear from what we were able to determine is that agencies have a turf war in Colombia, that because drugs are so important in Colombia, DEA has been given the top of the pyramid there. And they – it had to be negotiated with, and so things were slow. And they were negotiated with, you know, in some way by IRS and in some ways by ICE. And ultimately, DEA pushes everybody out of the picture. And then as we discover, largely – partly after trial, partly during trial, partly prior to trial, the government is telling people. In 2010, while he is still a registered confidential informant, the government – prosecutors are telling people – I mean, if one prosecutor in New York is telling, look, we've got no evidence, you've got to manufacture it. But that's not the worst of it. The worst of it is you have to find out everything that would relate to the public authority defense. We have to make the right decision here. And the way that they did that, it's similar to what happened in a case of mine from 40 years ago, Appendix Martinez, where the court – that oral argument said, yes, the government could have done more than throw the marijuana off the end of the boat when they brought it back to the port. That's – it was even worse here. They smashed the phones. They destroyed the email account inexplicably. They didn't download anything from the account. Here's the thing. The district court made a finding that there was no bad faith involved. I don't understand you to be saying that that was clearly erroneous. Have I missed something? I don't think – our understanding of the standard in that regard is not that there was a factual finding made that we disagree with. We don't have a factual finding of someone confessing that I did this because of this, I did this because of this. What we have is structural bad faith. The facts are not in dispute. We've said that bad faith is a factual question. It's a factual question when the facts are in dispute. When the facts are not in dispute, it can't be – somebody can't be affirmed on it on a clear error basis. It's got to be based on – at that point, it becomes a question of law. I mean, I suspect the government would say that they have a dispute with you over whether there was bad faith, right? They would have a dispute with us whether the standard of bad faith set by the Supreme Court was met, and we'd say clearly it was. It was. It's not a matter of whether Barola – whether you have to believe Barola or not, even though his testimony just doesn't make any sense. He's completely contradicted in what does he do with the text. He sets up an email account, special – one of these special secret email accounts, and it runs for over a year. Did your client receive the emails? Why doesn't your client have some responsibility? I understand it's dangerous, but it's his own secret email account, et cetera, et cetera. Why doesn't he have some responsibility to maintain access to this evidence if it's so important? Surely he knew that this was possible, that he would need this information. I haven't been to Colombia in more than 35 years, and I'm still scared. I mean – people – you do not walk around – That's certainly understandable, but on the other hand, he did save other information, and so that's what makes it a little bit tricky, right? Chronologically. He had the business card from the DEA agent, and there was some other information he had saved as well that would seem to be just as much of a security risk, so that's why it's a little confusing as to why he wouldn't have saved it. Judge, I don't know how to respond to that, other than the Constitution doesn't put a burden on a person who's not charged. That's true, but as you know, part of the test is whether he would have had another reasonable means of obtaining the information, and that is how it factors in. You're telling us he didn't, and maybe that's so, so I want to give you an opportunity to explain that given the circumstances that he seemed to have saved some of the other materials. Your Honor, it's simply not reasonable. I don't think anybody – this is – again, one of the post-trial discoveries is about the CIA working with him. He's supposed to be carrying around emails from the CIA in Colombia. I mean, his cooperation is about the top of the Colombian National Police, Oscar Navarro, which is, in our opinion – of course, our very biased opinion – is why we're here, because the DEA has to work with Navarro, so they pushed everybody out who was working with Montaño, but be that as it may, you can't walk around with that stuff. He had had people from the out – that he was working with who had tried to do this, and they were killed. That's why he got political asylum in Argentina. This is not the case where it was – I understand that. I'm just saying one of the things that was alleged or asserted was that he could have forwarded the information to his attorneys in the United States and then, I guess, deleted it or whatever. I understand where you're coming from. Your argument is that he couldn't have done that regardless. Part of the issue here is that the agents are saying that there were these 60 or 70 messages that he asserts that he interacted with Agent Barola on, and they say they never happened. That is where the issue is coming from. Well, it's just a logical impossibility that it wasn't – it didn't happen. I mean, it's a logical impossibility, and the people who were stunned by it were the people – actually, the U.S. attorneys who were actually demanding, including the post-trial discovery, where you have the USA saying, look, I've been asking for this, I've been asking for that. What happened? Where are these emails? Then they say, well, we discontinued the email account. I mean, again, if you're dealing with a government agency, you do kind of expect the government agency is going to be honorable. You don't expect that they're going to delete the account, deny your – it's like Mission Impossible. You don't get that – he didn't start out working for the CIA. They just jumped in and out. He didn't get that. All right, Mr. Clue. We've let you go over a few minutes, but you've saved five minutes for it. I do just want to say that we raised a cumulative error issue. It's not just this matter. The whole matter of even the material we had, we were severely restricted, and the denial of an adverse inference instruction in this case was extremely – the totality of everything from the Brady to the cross-examination restrictions, the prevention of admission of all these emails, which we did offer on more than one occasion, and the denial of the instruction and the failure to correctly instruct the jury. Cumulatively, this was not a case in which one can be confident that the jury properly evaluated the public authority defense, which relied on one real core issue. Was he or was he authorized to join the Uribeños and play along with the Uribeños? All right. Thank you very much, Mr. Clue. Ms. Hirsch. We're going to give you 20 minutes since I allowed Mr. Clue to go over why about that. May it please the court. Lisa Hirsch on behalf of the Appley, in this case, the United States. I'll start out, if that's all right with the court, with the destruction of the . . . Actually, before you get to that, I want to ask you about one of the other arguments that wasn't just raised, and that is with respect to the Argentinian documents. The prosecutor in this case said, Mr. Hernandez made a big deal about the defendant being in Argentina in 2007 and 2008, but yet they submitted no proof of that. The only person who testified to that was the defendant. My concern is that the reason that there was no evidence submitted of that, it seems like, was because the government objected to the inclusion of the Argentinian records, and the court granted that objection. I just want to give you an opportunity to address that, if you would, please. At trial, the Argentinian records stated reason for their introduction by the defense was to show that Mr. Landano was being politically persecuted, and that was why he was being indicted. The purpose of the documents was not to show his presence in Argentina. In fact, by asserting the public authority defense, he basically was saying, I did these crimes, but I was authorized. It's our position that the exclusion of these documents, one, for a different reason, a reason that they were rightfully, cannot now argue on appeal, that the other reason made it a harmful error. Also, I don't believe he was being politically objected to the argument at the time it was made. The defense also admitted that the defendant Landano had traveled using fake documents, and he was questioned about them at trial. The jury knew that he was living in . . . Landano testified during his defense case that he was living in Argentina, and he traveled, and he needed to travel with fake documents for his own safety. So given all those circumstances, I would tell the court that there's no error there, and there's certainly no harmful error given the circumstances in this case. Thank you. This is Mr. Newsom. I'm so sorry, but because I'm on the telephone, I hate to interrupt, but can I get you to address one thing before you get going on the destruction issue? Okay. It dawned on me in reading your brief that Landano's counsel made quite a big deal of this series of emails in October of 2010, back and forth between the DEA agents and the AUSA, and so far as I could tell, your brief really doesn't even address it. It seems to me that that's a pretty big part of his destruction case, and I think by extension, his adverse inference case. So what do you say about all of that? Well, I thought I had addressed it by saying that the government was simply seeking to find out from HSI whether Landano had made any statements and to obtain them. Defense Exhibit 5D is, I think, the exhibit that you're referring to. It's an email from DEA agent Chris Gomenas, who also was the signer of the extradition affidavit, and he wrote to the HSI agents that he was working . . . he was with DEA. He was working on the case, and he states, it is our understanding that you met with the defendant, with Lopez-Landano, on two occasions. If that is accurate, we would like to review any of Lopez-Landano's statements to ensure that there is not a public authority address defense. Also, that's the only one that I could find in the trial record, and perhaps that's why I didn't go more into detail. Two special agent monks asking for statements to ensure that there was not a public authority defense. There is another email cited in the brief under Defense Exhibit SSTT, which also is described as being an email from NAUSA and Barola. I could not find that in the trial record, but I did locate it in one of the sealed defendants pleading. His initial motion to dismiss, which is docket entry 341, and some of the emails that are discussed in the briefs are at 341-3, page 7. These emails show that DEA was trying to get HSI to see what had happened and find out that there were statements. 5D was admitted into evidence. The other ones were discussed with the witness. I interpret them as prosecutor and agent doing due diligence, trying to find what statements were out there. In neither of these emails do the authors state, please conserve and preserve your BlackBerry phones. There's no mention of BlackBerry phones in any of these emails. It's just we understand that you may have met with Londonio. Please let us know. We'd like to review his statements. If that wasn't clear from the brief, that the agent and the AUSA were merely doing due diligence to try to find out whether there were statements out there and to obtain them. A number of the sealed pleadings have emails attached to them. The only one that's marked for the trial is 5D. I found it very helpful in reviewing the brief to go through defense pleading 341-3 to read the emails that are attached. They're not marked for trial exhibits. They were submitted to the court in connection with the motion to dismiss. Judge Newsom, my answer is these emails, and they're all on or around October 14th, is just DEA saying we'd like to gather up his statements so we can assess the case. It doesn't say we want to destroy any evidence. It's merely a prosecutor and agent trying to gather up the materials so that they can have a full understanding of what they're dealing with when they indict this case. Is it pretty common, would you say, to expect that this type of defense might be asserted in a case like this? If someone has been a CI, wouldn't it be likely that they would at least try to raise this sort of defense? Given that, is that more of an explanation for why they were looking into it or more of a reason that the government should have been prepared to have this evidence? I think it's a reason why they were looking into it because when DEA learned that this is . . . when one part of DEA learned that Landaño had been signed up, they wanted to find out, and it was due diligence. It explains why they're looking for it. It's not . . . it's cast in another light that there was this attempt to destroy all this evidence and hide it, but the response in the emails is, we'll get everything to you. We'll get everything to you and at trial and at the evidentiary hearing. Agent Barolo . . . in fact, all three of the agents basically say that they've changed phones numerous times by the time, I think the defense attorney asked for the BlackBerry phones. In fact, the government disclosed in a pleading docket entry 326 that the agency had changed phones in 2012 and it was part of a normal proceeding and that the agents themselves may have changed phones earlier than the whole agency turning . . . changing over to iPhones. But that email that Barolo sends is a little bit odd, right? I mean, it has two different fonts in it and there's an explanation . . . since we're talking about the trial stuff, there's an explanation that he gives. He says, well, I just retyped it, but still, I mean, anybody who uses email knows it doesn't just sort of automatically change to a different font. What are we to make of that? If I'm understanding the testimony, I believe Barolo talked about cutting and pasting from his . . . He said he didn't. I thought he said he didn't. And I think at times he did retype that was . . . and he explained why he did it and that he explained that he had never used the emails, whereas Landaño said there were, I think, 70 emails. Some of the emails are attached to another sealed pleading because they . . . But what do we make of the fact that it's in two different fonts? I mean, two different typefaces, I guess I should say. Well, I think he explained it and the court accepted it because they did make . . . the court did make the decision not only of no bad faith, but that there had been no evidence of what was . . . that these things would support Landaño's public authority defense. There's a number of sealed documents attached to the defendant's motion, defense exhibit docket entry 468 is the defendant's response. It has many of the emails that are not in the trial record that the court can look at. But Barolo explained that and all the other agents who had used the BlackBerry phones also talked about. Agent Byrne, who didn't talk about using these particular iPhones, but he also testified about cutting and pasting. Agent Monks testified he changed phones several times. Barolo had to get a new phone after it went bad in Haiti. And Agent Plascencia left the Bogota office in September 2010, so a month before this email goes out asking them to preserve or to send the communications, but never were they asked to preserve the particular phones. That was never a request to preserve the particular phones, or that that was something that was being asked of them. What's your response to the specialty arguments made by your friend on the other side? That it has no merit the extradition order, which the court can find at docket entry 753-6 page 12. The Argentinian granted extradition as to case number 10-2763, this case, and count one concerning the conspiracy. The extradition affidavit is contained at docket entry 208-5 and in it the affiant doesn't name a single informant. He says that there were numerous cooperators and informants, but not one is named. So it's complete speculation that the case changed entirely when the affidavit contains allegations of transportation of that particular phone, thousands of kilograms of cocaine, confidential sources, and transportation and arrangement of loads of cocaine. So you're making a factual argument. You're saying that it's not at all the case that we wound up prosecuting a different case against Mr. Londano than we told Argentina we were going to prosecute against him. You're saying that that's just not factually correct, but you're not arguing that Mr. Clu's proposed rule would be wrong. I am arguing that Mr. Clu's proposed rule would be wrong. I guess I'm arguing both that. In the Puente's case, I made it very clear that the facts are not. It's the offense on which someone is extradited. I'm just calling into question also what he's saying factually. Let me ask you this then, just to see how far that could go. Let's say that it is a fraud case and the extradition deals with a fraud regarding a proposed campaign, and it's a false cancer cure. But when he gets here, the indictment charges him again with a fraud, wire fraud let's say. But it's a completely different scheme that's entirely unrelated to the wire fraud, to the fraud regarding the false cancer cure. It's a different wire fraud scheme. Would that be okay? I'm having issues with the hypothetical. I'm trying to figure out where we draw the line and how we... Because the government had to and did send Argentina the indictment. So I think your hypothetical veers into a different case. It's true. But in a drug, as you know, in a drug conspiracy charge, you can charge that a lot in a lot more circumspect way than you can a wire fraud charge. And so it wouldn't necessarily appear on the face of the indictment if you're charging a completely different conspiracy under a drug conspiracy. Right? I'm not sure. In the Puente's case, they actually superseded the indictment and added on time. And so there does seem to be room, and I know that you can... That the court has allowed for a 4B and other crimes evidence. So I'm not sure where the line is drawn. In this case, the exact indictment was presented to Argentina, and Argentina granted a 4B. Indictment on this count... I'm just saying that I think the affidavit was not as precise factually as Mr. Clu has argued. And all the affidavit is supposed to do is show the court, the foreign country, that there's reason or probable cause to extradite. As I understand Mr. Clu's argument, and I'm sure he'll let me know if I've got this wrong, but he's saying that in the extradition documents, the government alleged that Mr. Londonio was in charge of this big drug conspiracy. He was sort of the head guy in this big drug trafficking operation. And then as the case wound up being prosecuted, the government's position became different, and he was charging taxes on other people who were actually doing the drug trafficking. And that seems like it's a completely... Mr. Clu has argued that seems like it's a completely different drug trafficking conspiracy. So two questions. One, do you agree with that characterization? And if not, explain why. So I guess it's really three questions. And two, if you do agree with that characterization, then why is that okay under the doctrine here, the specialty rule? I don't read the affidavit as Mr. Clu reads it. The affidavit talks about investigation into the activities of the Urbanos, and that the United States had determined that this organization was led by Londonio. It controlled areas, engaged in cocaine transportation from there to other countries, that the government had information from both law enforcement agents and cooperating government witnesses. During the time period of the indictment, that there were thousands of kilograms shipped, adding in the taxes paid is part of the operation. So I don't see it as a separate... That's what you mean when you say they're responsible for the transportation. Well, it could encompass it, yes, for sure. It's part of the drug conspiracy. Thank you. Judge Newsom, anything else? Not for me, thank you. In conclusion, I'd just like to point, also point the court to the district court's order, docket entry 749. It was one of the post-trial motions where the district court found not only that there had been no showing of bad faith, but the court did not find evidentiary support for Londonio's claim that the messages would have supported his public authority defense. Thank you. Thank you. I ask that you affirm. All right, Mr. Clue, you have five minutes. Thank you, Your Honor, and I did want to mention, we didn't cite it in a, didn't file a supplemental authority notice, but the rule in this court is that when there is one or more preserved errors in a cumulative error argument, that we do not apply plain error to bar review of the other cumulative errors, and that's been the rule since the old Fifth Circuit, and I think that I should have put that in the briefs, but it is almost 50 years of precedent now to that effect, and I want to turn second to the Argentine records issue. The first point I want to make is that the court asked whether there was an objection when the court, when the government said, told the jury, oh, there's no evidence that he lived in Argentina. There was an objection. There was an objection, and it was partially sustained, but in a way that didn't, you know, tell the jury to disregard what the government had said. What was the specific objection? The objection was that they're burden shifting, you know, on us. They're burden shifting on us, and it wasn't that you made an erroneous ruling earlier, Your Honor. I mean, that's not a good objection at closing because the ruling's been made. Of course not, but even so. There was an objection. But even so, the objection doesn't tune the judge into knowing that the problem that you're having is that he wasn't allowed to use those materials to show that he was present in Argentina. Well, you know, again, we did not raise it as a jury, as a closing argument error. We raised it as a prejudice error because the question is, there's no question that the Argentine records should have been introduced. The notion that it was just to show political persecution, no, no, political persecution was part of the big picture to explain why their whole process, and this goes all the way back to the extradition argument, by the way. The extradition basically starts in 2000, with facts starting in 2009 to 2011. And if we'd gone to trial in 2009, 2011, that would have been a lot easier to prove because then we had people admitting, well, yeah, sure, as at least by 2008, you know, he was working as an informant. But no, at trial, they come up with, oh no, it's back in 2007. I think one person even said 2006 he's working for them, and that's why at trial it becomes important to show, yes, the political persecution part of this. Why are we dealing with these people? Why do we know these people? Because these are the same people that were politically persecuted with us. Did counsel proffer the documents in the district court for that purpose? He proffered them to be, there was pre-trial litigation as well as trial litigation, and it was, I think it was, I think it's fairly fair to say, yes, they were not, the objection was they're irrelevant. Again, first the objection was that they're irrelevant, and they clearly weren't. Not only the objection, but for what purpose were these documents proffered, and if so, for what purpose? To show, to bolster his testimony that he had left the country in 2007 when he got out of prison. He wasn't even available until he got out of prison because he had done this peace and reconciliation program. He gets out of prison. He'd ratted on the Colombian National Police. Other ALC members are getting murdered. He goes to, he seeks asylum in Argentina in 2007. It's all part of the same story to say that, oh, no, he was trying to show political persecution. Political persecution was not relevant. Where can we find that in the record before the district court? The, I'm going to, I would have to, I'd have to go back and find the specific, because it's an extremely large record. I don't have the specific sites. I can follow up with a brief letter. But there's no question that to say it was only, it was not admitted only because it had nothing to do with the case. We had him testifying to it. The whole issue was you can't prove you were in, you can't prove in Argentina. We've got records saying he was under restrictions in Argentina. He's basically on house arrest in Argentina. When these witnesses were saying, no, no, he's in Medellin running the whole, he runs Medellin in 2000, in 2007, according to them. So, I mean, it was, it was fundamental. I couldn't, I couldn't imagine why they're introducing it. I don't, I mean, that's, is a lot of ways to make a case unfair. If that's the government's best argument, that's not a good argument. Those records should have come in and they're fundamental and they prove the whole point. It goes back to, again, it all winds, it all folds together. He goes, he gets extradited and when he's in Argentina, he can't raise that defense there to the, to the extradition because they're saying the facts are of 2009. And you can't say, oh no, I wasn't, I wasn't here because he knows, because the email show, I mean, the email show in other ways and the emails that we didn't, weren't allowed to get into the record show that he's induced to come back in. He's, you know, he's working on an FBI case. Again, we never got the FBI records. We never got the CIA records. This is not a made up case. This is a case where you have lawyers who are maybe not doing the best job in the world, but that's, I mean, and it's puts a terrible burden on this court, but this is a terrible injustice case. Nobody should have to go through this. You can't just say, uh, we, we, we, we have the right to, to destroy our, our Blackberry. Sure. You want to destroy your Blackberry, destroy your Blackberry. There are government records on that Blackberry. There are laws in this country about destroying government records. What they did was illegal. All right. Thank you, Mr. Clue. Uh, before I ask you to sit down, let me just check with you, Mr. Clue. No, thank you, Judge Rosenbaum. I'm good. Okay. Thank you. All right. Thank you both. We appreciate your time and we'll be in recess for the day.